# EXHIBIT 1

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
MOVE, INC.; MOVE SALES, INC.; NEWS CORPORATION;
NATIONALASSOCIATION OF REALTORS; OPCITY ACQUISITION, LLC;
OPCITY, INC. and DOES 1 through 20, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
*JAMES BANDY; JUAN CARLOS CARRERA, BRYAN CASTRO; MICHAEL*
*ECHTERNKAMP; KAMESHA SYLVESTER HAMILTON; MARIA HARDY; NIDIA*
*SANCHEZ and CLIFF WOODHALL; each individually and on behalf of all other*
*similarly-situated*

To keep other people from seeing what you entered on your form, please press the Clear This Form button at the

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/23/2024 8:39 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By M. Aguirre, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br><br>L.A. SUPERIOR COURT, 111 N. HILL ST.<br>LOS ANGELES, CA. 90012 | **CASE NUMBER:**<br>*(Número del Caso):*<br><br>24STCV21494 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
  Michael S. Traylor (SBN 136814), 8601 Lincoln Blvd. 180, Suite 525, L.A., CA. 90045  (310) 401-6610

DATE: 08/23/2024        David W. Slayton, Executive Officer/Clerk of Court   Clerk, by _____ M. Aguirre , Deputy
*(Fecha)*                                                                    *(Secretario)*                         *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Save This Form    Print This Form    Clear This Form

For your protection and privacy, please

Michael S. Traylor, Esq. (SBN 136814)
traylorlawoffice@gmail.com
TRAYLOR LAW OFFICE, PC
8601 Lincoln Blvd. 180, Suite 525
Los Angeles, CA 90045
Telephone: (310) 401-6610

Attorneys for Plaintiffs

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/23/2024 8:39 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By M. Aguirre, Deputy Clerk

# SUPERIOR COURT OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| JAMES BANDY; JUAN CARLOS CARRERA, BRYAN CASTRO; MICHAEL ECHTERNKAMP; KAMESHA SYLVESTER HAMILTON; MARIA HARDY; NIDIA SANCHEZ and CLIFF WOODHALL;<br><br>each individually and on behalf of all other similarly-situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>MOVE, INC.; MOVE SALES, INC.; NEWS CORPORATION; NATIONAL ASSOCIATION OF REALTORS; OPCITY ACQUISITION, LLC; OPCITY, INC. and DOES 1 through 20, inclusive,<br><br>    Defendants. | **CASE NO.** 24STCV21494<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES:**<br><br>1) **Fraudulent Inducement (Contract)**<br>2) **Breach of Oral Contract**<br>3) **Breach of Implied Covenant**<br>4) **Fraud (Misrepresentation)**<br>5) **Conversion**<br>6) **Notice (Only) of Violation of CLRA**<br>7) **Unfair Business Practices** |

COME NOW, Plaintiffs James Bandy, Juan Carlos Carrera, Bryan Castro, Michael Echternkamp, Kamesha Sylvester Hamilton, Maria Hardy, Nidia Sanchez and Cliff Woodhall each on their own behalf and as representatives of those who are similarly situated as set forth hereinbelow. Said Plaintiffs (each a "Plaintiff" and

collectively the "Plaintiffs") make the following allegations based upon information and belief and see designation of themselves as class representatives on behalf of those who are similarly situated.

## **PARTIES, JURISDICTION AND VENUE**

1.      Each Plaintiff is an individual who is also a licensed real estate agent and was fraudulently induced by Defendants to purchase so-called "lead generation" services from the Defendants under various brands owned and operated jointly and severally by each of the Defendants and to the collective, mutual benefit of said Defendants.

a) Plaintiff James Bandy is a real estate agent and resident of the State of Nevada conducting business therein.

b) Plaintiff Juan Carlos Carrera is a real estate agent and resident of the State of Nevada conducting business therein.

c) Plaintiff Bryan Castro is a licensed real estate agent and resident of the State of California conducting business therein.

d) Plaintiff Michael Echternkamp is a licensed real estate agent and resident of the State of Washington conducting business therein.

e) Plaintiff Kamesha Sylvester Hamilton is a licensed real estate agent and resident of the State of Florida conducting business therein.

f) Plaintiff Maria Hardy is a licensed real estate agent and a resident of the State of New York conducting business therein.

g) Plaintiff Nidia Sanchez is a licensed real estate agent and a resident of the State of Georgia conducting business therein.

h) Plaintiff Cliff Woodhall is a licensed real estate agent and a resident of the State of Florida conducting business therein.

i) Each such Plaintiff and all Plaintiffs collectively seek to proceed as class representatives for similarly-situated real estate agents who reside in various

1    states throughout the United States.

2        2.    At all relevant times mentioned herein, Defendants consist of:

3        (a) Defendant Move, Inc. ("Move, Inc.") is a corporation organized and

4    existing under the laws of the State of Delaware with its principal place of business

5    in Los Angeles, California.

6        (i) Move, Inc. is a real estate listing company. The company

7    operates the so-called "Move Network" of real estate websites, the largest of which is

8    "Realtor.com". Move, Inc. owns the listing syndication and reporting platform

9    "ListHub." The company also operates "Avail" (following its acquisition in 2020),

10   "Doorsteps.com" (following its acquisition in 2013),  as well as "Moving.com",

11   "Relocation.com" and "UpNest" (following its acquisition in 2022). Move, Inc.

12   utilizes each of these brands, web properties and the data derived from interactions

13   therewith by real estate agents and consumers in connection with its so-called "lead-

14   generation" business which is the subject of this action.

15       (ii) Move, Inc. also has a longstanding partnership with Defendant

16   National Association of Realtors ("NAR"), the real estate industry's largest trade

17   association, for operating Realtor.com and the NAR web properties. As a result,

18   Move, Inc. has positioned itself as the voice of the NAR and all real estate agents

19   associated therewith. Move, Inc. relies upon and takes advantage of this positioning

20   in perpetrating and/or ratifying the unlawful conduct alleged herein. Such positioning

21   is a key factor which allows Move, Inc. to successfully engage in the unlawful conduct

22   alleged herein because the Plaintiffs (and each member of the prospective class of

23   plaintiffs) relies upon Move, Inc. to faithfully, honestly and responsibly advocate for

24   the nation's real estate agents and maintain each of their professional best interests in

25   the real estate industry. Move, Inc. has made NAR complicit in the allegations

26   contained herein. Also, Move, Inc. and the other Defendants have utilized its

27   association with NAR to facilitate the unlawful conduct alleged herein.

28       (b) Defendants Move Sales, Inc., REA Group, Ltd., OpCity, Inc. and

OpCity Acquisition, LLC are each wholly owned subsidiaries of Move, Inc. and Defendant News Corporation ("News Corp.") which operate a number of various brands of Move, Inc. in furtherance of the scheme and unlawful conduct alleged herein.

(c) Defendant OpCity, Inc is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of California. It is a wholly owned subsidiary of Move, Inc. and News Corp. that operates a number of various brands of Move, Inc. in furtherance of the scheme and unlawful conduct alleged herein.

(d) Defendant OpCity, Acquisition, LLC is a limited liability company corporation organized and existing under the laws of Delaware with a principal office in the State of Texas. It is a wholly owned subsidiary of Move, Inc. and News Corp. that operates a number of various brands of Move, Inc. in furtherance of the scheme and unlawful conduct alleged herein.

(e) Defendant News Corporation ("News Corp.") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Los Angeles, California. News Corp owns and operates Move, Inc. and the other co-defendants named herein and is directly involved in the unlawful conduct alleged herein,

(f) NAR is the largest trade association in the United States and is purportedly operated for the benefit of those who work in the real estate industry. NAR holds a United States  trademark over the term "Realtor" and purportedly functions as a self-regulatory organization for real estate brokerages. For decades, NAR has held itself out as *"America's largest trade association, **representing 1.5 million+ members [including each Plaintiff herein and each member of the class of plaintiffs alleged herein]**, including NAR's institutes, societies, and councils, involved in all aspects of the residential and commercial real estate industries.*  In connection with each of the allegations alleged herein, NAR has knowingly conspired

with, aided and abetted and participated in the conduct alleged herein against NAR's co-defendants. More specifically, NAR has, with full knowledge of the unlawful activities by its co-defendants alleged herein:

i) authorized its co-defendants to utilize NAR's name, logo, intellectual property, database and goodwill to market, promote and legitimize the products and services of its co-defendants;

ii) utilized its special relationship with each Plaintiff (and the alleged class) to endorse, market, promote, legitimize and facilitate its co-defendants' solicitation of each Plaintiff (and the alleged class) to purchase, rely upon and maintain the products and services offered by said co-defendants;

iii) issued licenses to, allowed use of its intellectual property by and/or refused to enforce its intellectual property rights against its co-defendants (specifically the term "Realtor") to utilize the phrase "Realtor.com" and the accompanying URL for the sole purpose of aiding and abetting said co-defendants in soliciting Plaintiffs (and the alleged class members) to purchase, utilize and maintain the products and services of its co-defendants despite knowing that its co-defendants were making material misrepresentations about the quality of leads its co-defendants sold to Plaintiffs.

iv) provided its co-defendants with internet user data, personally identifying the contact information for its "members" for purposes of facilitating its co-defendants' solicitation of the Plaintiffs (and the alleged class members);

v) taken other similar action(s) designed to aid and abet its co-defendants in the solicitation of NAR members and to endorse, promote and recommend said co-defendants' products and services to Plaintiffs (and the alleged class members); and

iv) in connection with each of the foregoing, derived revenue and goodwill resulting from the foregoing and the unlawful conduct of NAR's co-defendants.

3.    Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as DOES 1 through 20, inclusive, and therefore sues these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and each of Plaintiffs' injuries as herein alleged were actually and proximately caused by the actions and/or omissions of the defendants sued herein.

4.    Each Plaintiff is informed and believes and thereon alleges that in connection with the acts and omissions alleged herein, each and all of the defendants sued herein, together with those unknown to Plaintiffs, entered into a partnership, employment, joint venture, and/or principal-agent relationship to carry out all of the acts and omissions herein alleged. At all times herein mentioned, each such Defendant has been and continues to be the employees, agents, partners, employers, principals, and/or joint venturers of each of their Co-Defendants, and in acting and omitting to act as alleged herein, acted and/or failed to dutifully act: (i) both on their own behalf and on behalf of their employees, agents, partners, employers, principals, and/or joint venturers; (ii) within the course and scope of an agency, joint venture and/or partnership; and (iii) with the authorization, direction, ratification, and adoption of their co-defendants, principals, joint venturers, partners, employees, and/or agents. Accordingly, each of them is jointly and severally liable and/or vicariously liable for the conduct of each of the others. Plaintiffs may seek leave of court to allege the exact nature of such interrelationships when the same are fully ascertained.

5.    Defendants, and each of them, engaged in a civil conspiracy to deprive Plaintiffs and other similarly-situated real estate agents and/or brokers of their rights

and to cause Plaintiffs and such other similarly-situated real estate agents and/or brokers injury, harm and damages. Each Defendant aided and abetted the other in furtherance of the civil conspiracy with actual, inquiry and constructive knowledge of the commission of each of the unlawful acts alleged herein. At the center of the conspiracy is a central team of decision-makers, officers, managers, members and senior executives each of whom acted in concert with each of the Defendants and each other in furtherance of the unlawful activity alleged herein.

6.     Those Defendants who purport to have limited liability due to their status as a partnership, corporation and/or limited liability company have lost such protection and should have their so-called "corporate veil" pierced due to the fact that they did not comply with the formal requirements necessary to maintain such veil of limited liability and acted as individuals and with a unity of interest and ownership between the purported entity and its owner(s) such that it would be unfair if the acts in question are treated as those of the purported entity alone.

7.     Defendants have a history of operating their businesses in a fraudulent, deceptive and unlawful manner and have received hundreds (if not thousands) of complaints and threatened lawsuits from Plaintiffs and others who are similarly-situated for the identical conduct alleged herein, which complaints and threatened lawsuits have been communicated up to corporate leadership for each Defendant but were actively concealed from Plaintiffs. In addition, Defendants, at the highest levels of their respective organizations, were aware of complaints being made by real estate agents and brokers for such conduct to a number of administrative, government and/or regulatory agencies. In response, Defendants have not only continued and intensified the unlawful conduct alleged herein; but have taken steps to conceal, deceive and cover-up the unlawful activities employed by the Defendants, to Plaintiffs' detriment.

8.     In addition to the foregoing, Defendants, and each of them, have consistently failed and refused to properly train, screen, conduct background checks, supervise, reprimand, direct and instruct its senior management personnel in a manner

at or above the standard of care and in accordance with Defendants' stated policies and the laws of the State of California and the states wherein each Plaintiff conducts business utilizing services provided by the Defendants. In fact, Defendants at the highest levels and at Defendants' headquarters in California, have undertaken to train Defendants' sales personnel in a manner which is designed to deceive and defraud real estate agents and brokers regarding the scope, efficacy, costs, availability of refunds or credits and other aspects of the products and services sold by Defendants to Plaintiffs and other similarly-situated real estate agents and brokers.

9.     Venue lies in the Los Angeles County Superior Court in that Defendants operate their businesses in the County of Los Angeles, State of California and take advantage of resources, laws and benefits offered to companies who operate, conduct business and employ persons in the County of Los Angeles, State of California. Defendants committed many of their unlawful practices in the County of Los Angeles, State of California and within this judicial district. Defendants maintained and continue to maintain records relevant to such practices alleged herein in the County of Los Angeles, State of California and within this judicial district.

## ADDITIONAL FACTS COMMON TO ALL CAUSES OF ACTION

10.     Defendants advertise, market, promote and sell a so-called "Lead-Generation" line of products and services to real estate agents throughout the United States. Defendants employ a large, aggressive sales force which cold-calls, contacts and solicits business from real estate agents  (like Plaintiffs). In so doing, Defendants provide sales personnel with scripts to use in soliciting real estate agents and brokers. Those scripts contain a number of false and misleading statements and the sales personnel are otherwise instructed to provide false and misleading information (the "Misleading Information") which includes:

a) Defendants own and operate a so-called "lead-generation" business (the "Lead Generation Business") with the following attributes:

- 8 -

Case No.:

i) Defendants lawfully and in compliance with applicable privacy laws, obtained large volumes of consumers who were currently interested in purchasing residential real estate properties and also were in need of a local real estate agent;

ii) Defendants continuously vetted, updated, verified and maintained the foregoing data and personally identifying information for each such person so that any information provided to a Plaintiff would be current, accurate and maintain the characteristics of a "Lead" as stated hereinbelow;

iii) Defendants organized and sorted such data and interested individuals by zip code;

iv) Defendants grouped the foregoing data, individuals and information into small groups (a minimum of 36-40 vetted persons which qualified as a "Lead" as characterized herein) and sold the contact information for such persons to real estate agents who subscribe to Defendants' various Lead Generation Business products, which were distributed on a highly limited basis;

v) When Defendants grouped the foregoing data and sold it to Plaintiffs, each purchasing Plaintiff would be the only real estate agent to receive that particular grouping of data or that such grouping of data would be shared with one other real estate agent; however, such grouping of data would not be widely disseminated.

vi) Each such person (along with their data) would be a "Lead" for which each Plaintiff would pay a set price for a minimum of 36-40 such "Leads" per month.

b) Defendants Lead-Generation Business is based upon legitimate and verified "Leads" and therefore provided each Plaintiff a premium and exclusive opportunity to obtain clients;

c) The information obtained by Defendants was voluntarily and lawfully acquired from such persons who were currently and legitimately desirous of the

1  services of a licensed real estate agent;

2         d) Defendants' Leads are exclusive and will not be shared with other real
3  estate agents or brokers and/or such leads are limited in distribution to one other real
4  estate agent or broker;

5         e) Defendants will distribute such "Leads" on a priority and/or exclusive
6  basis to real estate agents or brokers who pay higher fees or subscription rates;

7         f) Plaintiffs would be refunded or credited for the Leads which turned
8  out to be incorrect, inaccurate and/or which otherwise did not meet the foregoing
9  attributes for what is described herein as a "Lead";

10        g) Defendants undertook ongoing efforts to maximize the legitimacy of
11 such Leads and minimize any duplication of selling the same Lead(s) to multiple real
12 estate agents;

13        h) Subscribing real estate agents (including each Plaintiff and each
14 member of the prospective class) will receive a "minimum" number of Leads
15 (generally 36 – 40 leads) per month and any shortage would be refunded or properly
16 credited to each Plaintiff's account;

17        i) Other similar communications and designations which suggest the
18 reliability, exclusivity, accuracy and value of each such Lead.

19        11.   In addition, Defendants failed to disclose to Plaintiffs that they utilize
20 other owned, controlled, operated and affiliate websites, web properties, media
21 (including digital media and social media) and technologies related thereto
22 (collectively the "Affiliates") to obtain, collect, harvest, scrape, analyze, store, access,
23 organize and manipulate the personal information of and identify potential "leads"
24 who are both legitimately interested in buying residential properties and many of
25 those who have no such interests in the foregoing. These processes (the "Unlawful
26 Bundling") are designed to amass a tremendous (and tremendously growing) database
27 which the Defendants then characterize as "leads". The Unlawful Bundling is
28 facilitated by the operation of such numerous websites and brands which are designed

to attract, even tangentially, anyone who interacts with key words such as "home", "property", "real estate", "house", "mortgage", "rent", etc. and intentionally includes prospective purchasers of vehicles, unrelated products and services, non-existent consumers, duplicative consumers and other persons with no interest whatsoever in purchasing real estate properties. Defendants engaged in the Unlawful Bundling of all of these persons and presented each of them to Plaintiffs (and each member of the prospective class) as a vetted and verified collection of legitimate "leads" (i.e., a consumer who was seeking the services of a real estate agent).

12.    Notwithstanding the foregoing, at all relevant times, Defendants were (and remain) keenly aware that at approximately half of these so-called "leads" that Defendants bundled and sold to Plaintiffs were not "leads" at all; but a series of individuals for whom Defendants have collected personally identifying information but who have no interest in purchasing real estate. In fact, in many cases, Defendants knew they could not verify that the personally identifying information sold to Plaintiffs is even legitimate or truly associated with an actual, living human being. Despite knowledge of the foregoing, Defendants failed and refused to take any action to vet, legitimize and/or confirm the identity of these so-called "leads" and deliberately sold fake and false leads along with other leads which ranged from highly questionable to legitimate. Defendants engaged in this behavior specifically to defraud, deceive and take advantage of each of the Plaintiffs (and the class that such Plaintiffs seek to represent) by falsely increasing the size and scale of Defendants' offerings of the products and services.

13.    Defendants' distribution of the Misleading Information and Unlawful Bundling of personally identifying information and consumer data were designed to create an exaggerated, padded and fraudulent database of so-called "Leads' which would be sold to unsuspecting real estate agents (including each of the Plaintiffs and each member of the class that Plaintiff seek to represent in this action). Defendants would then proceed to package and sell these databases to Plaintiffs (and those

- 11 -

CLASS ACTION COMPLAINT FOR DAMAGES

similarly situated) as "Leads" knowing that approximately fifty percent (50%) or more of such "Leads" were not legitimate, potential real estate transactors. Defendants would further characterize these so-called "leads" as "exclusive", "shared" (with only one other agent) "premium" or otherwise denote that each Plaintiff and other purchaser was obtaining high quality access to a high-quality group of "Leads". Defendants further misled, defrauded and intentionally deceived each of the Plaintiffs (and each potential member of the class) by representing that by paying subscription fees, enhanced subscription fees and other payments; each such real estate agent was obtaining specific benefits which had a high likelihood to generate business and clients for each such real estate agent.

14.    Notwithstanding the foregoing, Defendants (and each of them) knew and designed this scheme with the knowledge that approximately half of such "Leads", unbeknownst to users of Defendants' products and services were not intended or designed to result into any legitimate, potential business for each Plaintiff and other real estate agents who purchased said "Leads". Each of the Defendants is well-aware of the scheme and the unlawful conduct which characterizes said scheme. Furthermore, each Defendant conspired, collaborated and designed the scheme to be concealed from Plaintiffs and other real estate agents for purposes of defrauding said Plaintiffs and real estate agents.

15.    Defendants were not satisfied. Defendants proceeded to develop this scheme in an effort to further defraud and cause harm to the Plaintiffs and other real estate agents who purchased Defendants' products and services. More specifically, Defendants calculated that Defendants could earn significant revenue from these fake leads (the "Fake Leads") by engaging in the following practices (the "Scheme"):

a) massively distributing the Misleading Information and utilizing the Defendants' association with NAR to fraudulently induce trust and reliance in such Misleading Information;

b) employing a sales' team which was trained who were provided

Case No.:

various scripts designed to disseminate the Misleading Information along with other false and fraudulent information (including by withholding relevant truthful information) in an effort to defraud, deceive and mischaracterize the value and potential effectiveness of Defendants' Lead-Generation business:

i) Such sales' teams were enticed with large commissions for sales and punished severely for cancellations by Plaintiffs;

ii) Such sales' teams were trained to utilize specific language approved by corporate leadership in interacting with Plaintiffs which was designed to mislead and defraud Plaintiffs;

iii) Such sales' teams and affiliated customer service teams were trained on how to further deceive and defraud complaining Plaintiffs in a manner designed to wear-down such Plaintiffs who complained about the Fake Leads and cause attrition of such complaints while refusing to properly refund, credit and/or account to Plaintiffs for the substantial number of Fake Leads (roughly 40% of the total Leads);

c) requiring Plaintiffs and other real estate agents to sign-up for the various Lead-Generation products and services online without providing such Plaintiffs and other real estate agents with contracts, terms and conditions therefor, but then distributing contracts, terms and conditions after Plaintiffs and other real estate agents had already committed to the Lead-Generation products and services;

d) unilaterally changing the contracts, terms and conditions which Plaintiffs and other real estate agents were purportedly obliged by at various times (without notice) in an effort to utilize new and different provisions in an effort to preclude lawsuits relating to the Fake Leads;

e) implementing an ineffective, arduous, frustrating, inconsistent, deceitful, non-responsive and attrition-based customer service program (the "Attrition Program") which was designed to wear down Plaintiffs and other real estate agents so that most would not be able to pursue refunds of the significant fees paid by them

to Defendants and thereby allow Defendants to retain revenue from sales of Fake Leads;

f) offering Plaintiffs worthless "credits" and denying promised (and contractual) refunds for selling the Fake Leads which so-called "credits" included additional Fake Leads which would cause a repetitive cycle of Plaintiffs (and other real estate agents) never getting the substance nor value of what was promised to them in the Misleading Information;

g) fraudulent accounting practices which consistently mischaracterize the payments, credits, partial refunds and/or value of the legitimate leads versus the Fake leads knowingly distributed by Defendants;

h) selling the same Fake Leads (and even legitimate leads) over and over to various Plaintiffs and other real estate agents while representing that such leads were "exclusive" or were otherwise being shared with only one (1) or a very small number of other real estate agents instead of being massively distributed in a duplicative fashion;

i) wrongfully denying claims for credits and refunds for Fake Leads;

j) using the existence of the Fake Leads as a basis for selling more expensive products and services with promises of higher-quality leads when such statements were untrue and such more expensive products and services included a substantial number of Fake Leads also;

k) failing and refusing to honor the terms of the applicable contract(s);

l) repetition of the foregoing as a cyclical process designed to either cause attrition, further the Defendants' fraudulent and unlawful behavior and cause ongoing losses and damages to each Plaintiff (and other real estate agents); and

m) other unlawful, fraudulent, untruthful and draconian conduct to create attrition and/or refuse to honor the promises, obligations, duties and legal requirements owed by Defendants to each Plaintiff and to each member of the class of persons the Plaintiffs seek to represent in this action.

16.   At the core of this scheme was the Defendants' business strategy to generate income from selling and re-selling forty percent (40%) to fifty percent (50%) Fake Leads included within the legitimate Leads. Defendants built their business model, in part, on this principle and obtained financing, funding and engaged in a number of acquisitions and/or equity-based transactions based on such principle and ill gotten gains that resulted from this scheme.

17.   NAR is (and at all times was) independently and intimately aware of the Scheme and complicit therein through NAR's relationship with and reliance upon the other Defendants to build its membership ranks. NAR allows and contributes to its affiliation with its co-defendants to act as a broad endorsement of the conduct alleged herein (and the co-defendants' Fraudulent Scheme itself) so that the Plaintiffs and each member of the prospective class trusted and relied upon NAR's affiliation with the other Defendants and based at least in part on that relationship chose to do business with the other Defendants. NAR actively and passively induced each of the Plaintiffs (and each member of the prospective class) to do business with the Defendants.

18.   Defendants' unlawful conduct alleged herein is so widespread that it has caused harm to the goodwill of each prospective class member and the residential real estate agency (and brokerage) business as a whole. Defendants have previously been sued for nearly identical conduct and resolved such lawsuits; but yet continue to operate the Scheme and the fraudulent and unlawful business practices alleged herein. Defendants' conduct (in each instance) is intentional, well-designed and specifically planned to defraud, deceive and deprive Plaintiffs (and each member of the prospective class) of their rights while maximizing ill-gotten gains, revenue and profits for Defendants while Defendants have no intention of honoring their commitments or legally required conduct. Defendants are reckless and irreverently damaging the reputation and goodwill of each Plaintiff (and each prospective class member) by causing a predatory environment among real estate agents that offends, inconveniences, angers, harasses and unfairly targets consumers and results in

1    Plaintiffs paying inflated prices for Fake Leads.

2        19.    The foregoing conduct is not only intentional, but recklessness,

3    despicable and done in conscious disregard of Plaintiff's (and each prospective class

4    members') fundamental rights. Defendants, their senior executives, managing agents,

5    managers, directors and officers committed the acts described in this complaint and

6    in each cause of action intentionally, wilfully, oppressively,

7    fraudulently and maliciously for the purpose of injuring each Plaintiff and depriving

8    each Plaintiff of that Plaintiff's rights. Similarly, Defendants have done so

9    intentionally, wilfully, oppressively, fraudulently and maliciously for the purpose of

10   injuring each prospective class member. Defendants intended to cause the alleged

11   harm, injuries and damages alleged herein and engaged in such conduct

12   with a willful and conscious disregard of the fundamental rights of those Plaintiffs

13   and prospective class members which were harmed. Defendants, their senior

14   executives, managing agents, managers, directors and officers used their superior

15   power (as well as their position as the representatives of the authority over the Plaintiff

16   along with threats and intimidation to subject Plaintiff to cruel and unjust hardships

17   in conscious disregard of Plaintiff's rights. All of the foregoing conduct was

18   undertaken by the Defendants and their owners, managing agents, senior

19   executives, supervisors, directors and officers. Accordingly, Plaintiff also seeks any

20   allowable and/or appropriate punitive or exemplary damages which may be or become

21   available against Defendants in an amount appropriate to punish and make an example

22   of them in addition to the other damages sought herein, subject to applicable law.

23

24                    **CLASS-RELATED ALLEGATIONS**

25        20.    Plaintiffs seek certification of this action as a "class action" pursuant to

26   California Code of Civil Procedure ("CCP") Section 382. This action satisfies the

27   numerosity, commonality, typicality, adequacy, predominance, and superiority

28   requirements of Section 382 of the CCP in that  the claims, allegations, unlawful

- 16 -                                      Case No.:

conduct, elements of each cause of action and the "Scheme" for selling Fake Leads (as defined hereinbelow) itself are each a matter of systematic, common, general and repetitive conduct which is of a common or general interest, of many persons.  Said "persons" are the real estate agents who subscribed to the various Lead Generation products and services of the Defendants. Each of the Plaintiffs and each member of the proposed class has been induced, defrauded and suffered damages by the same practices, policies and schemes utilized by Defendants in connection with Defendants' Lead Generation products and services.

21.    Plaintiffs seek to certify a nationwide class as defined as follows: All real estate agents within the United States who, from the date four (4) years prior to the filing hereof until the date that notice of this class action is disseminated to the class, purchased leads from Defendants that included Fake Leads (the "Class Members").

22.    Plaintiffs reserve the right to propose or eliminate sub-classes and to amend or otherwise alter potential sub-class definitions in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

23.    Plaintiffs' claims satisfy the numerosity requirement because members of the class are so numerous that their individual joinder is impracticable. The precise number of Class Members and their addresses are known to Plaintiffs, or will be known to Plaintiffs through discovery.  Class Members may be notified of the pendency of this action by mail, electronic mail, the Internet, or published notice.

24.    Common questions predominate because common questions of law and fact exist as to all Class Members.  These questions predominate over any questions affecting only individual Class Members. These common legal and factual questions include, without limitation:  whether Defendants sold Fake Leads to Class Members despite representing such leads as vetted, viable leads from prospective buyers.

25.    Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the Class Members sustained losses and damages arising out of Defendants' common course of conduct in violation of California law as alleged

herein.  The losses and damages of each Class Member were caused directly by Defendants wrongful conduct in violation of California law.

26.    Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiff's interests do not conflict with the interest of the Class Members Plaintiffs seek to represent.    Plaintiffs have retained counsel competent and experienced in complex litigation and Plaintiffs intend to prosecute this action vigorously.

27.    A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all Class Members is impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions require.  Furthermore, as the damages of each individual Class Member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing this matter as a class action.  The costs to the court system of adjudication of such individualized litigation would be substantial.  Individualized litigation would also present the potential for inconsistent or contradictory judgments. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## I. FIRST CAUSE OF ACTION
## BY PLAINTIFFS AND THOSE SIMILARLY SITUATED
## AGAINST EACH DEFENDANT FOR FRAUD (FRAUDULENT
## INDUCEMENT TO ENTER INTO A CONTRACT

28.    Plaintiff re-alleges and incorporates herein by this reference Paragraphs

1-27 above as if they were fully set forth here.

29.    The elements of fraud are (a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage. Fraud in the inducement is a subset of the tort of fraud. It occurs when "the promisor knows what he is signing but his consent is induced by fraud" mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.[1] Each Plaintiff was contacted  by Defendants' salespeople via telephone, often times with claims of limited time "promotions", and as alleged in Paragraph 10, above, fraudulently induced to enter into a verbal agreement with the Defendants. The process and the scope of the fraud were duo fold in that the Defendants induced each Plaintiff (and prospective class member) to enter into a lead-generation agreement with Defendants by first providing the False Information and then inducing each Plaintiff (and prospective class member) to sign-on (electronically) with Defendants. The scope of this "agreement" was limited to an exchange of money for Defendants' lead-generation services which were characterized as set forth hereinabove.

30.    In connection with each named Plaintiff:

a.    Plaintiff James Bandy received the Misleading Information from Defendants thorough the marketing efforts of the Defendants. Such marketing efforts included disseminating the Misleading Information to Bandy. Plaintiff Bandy reasonably relied upon the Misleading Information and contacted Defendants' sales personnel by telephone in and after August 2020 to request further information. During multiple telephone conversations with Defendants' employee (known to Defendants), Plaintiff Bandy was again provided with the Misleading Information (including, that he would be provided high quality, useful leads on prospective buyers) by Defendants and encouraged to enter into an oral agreement with

---

[1] *Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 294–295 and *Geraghty v. Shalizi* (2017) 8 Cal.App.5th 593, 597.

Defendants for Leads. Plaintiff Bandy was also told during the conversation that he would be one (1) of no more than two real estate agents who would receive Leads per zip code purchased.  Such statement was not true and was known by Defendants to be a false statement. Despite knowing about the entirety of the Scheme (and the inclusion of Fake Leads in the Leads that were promised by Defendants as part of the agreement), Defendants reasserted the Misleading Information for the sole purpose of fraudulently inducing Plaintiff Bandy to enter into the oral agreement and begin subscription services with Defendants, and Plaintiff Bandy did actually rely on the Misleading Information by providing his credit card number to Defendants at the conclusion of the sales call to initiate a subscription for Leads. Additionally, Plaintiff Bandy was aware of the affiliation between Defendant NAR and each of NAR's co-Defendants herein when he entered into the oral agreement with Defendants. As NAR had ardently presented itself as an advocate for real estate agents (including each Plaintiff), Plaintiff Bandy trusted the Defendants and believed the Misleading Information to be true, accurate and beneficial.

b.    Plaintiff Juan Carlos Carrera received the Misleading Information from Defendants thorough the marketing efforts of the Defendants. Such marketing efforts included dissemination of the Misleading Information to Carrera. Plaintiff Carrera reasonably relied upon the Misleading Information and contacted Defendants' sales personnel by telephone in November 2021 to obtain further information. During multiple telephone conversations with Defendants' employee (Steven Brown), Plaintiff Carerra was again provided with the Misleading Information  (namely that he would be provided high quality, useful leads on prospective buyers) by (and on behalf of) Defendants and encouraged to enter into an oral agreement with Defendants for Leads. Plaintiff Carrera was also told during the conversation that he would be one (1) of no more than two real estate agents who would receive Leads per zip code purchased.  Such statement was not true and was known by Defendants to be a false statement.  Despite knowing about the entirety of

the Scheme (and the inclusion of Fake Leads in the Leads that were promised by Defendants as part of the agreement), Defendants reasserted the Misleading Information for the sole purpose of fraudulently inducing Plaintiff Carerra to enter into an oral agreement and begin subscription services with Defendants, and Plaintiff Carerra did actually and reasonably rely on the Misleading Information by providing his credit card number to Defendants at the conclusion of the sales call to initiate a subscription for Leads.  Additionally, Plaintiff Carerra was aware of the affiliation between Defendant NAR and each of NAR's  co-Defendants herein when he entered into the oral agreement with Defendants. As NAR had ardently presented itself as an advocate for real estate agents (including each Plaintiff), Plaintiff Carerra trusted the Defendants and believed the Misleading Information to be true, accurate and beneficial.

          c.     Plaintiff Bryan Castro received the Misleading Information from Defendants thorough the marketing efforts of the Defendants. Such marketing efforts included disseminating the Misleading Information to Castro. Plaintiff Castro reasonably relied upon the Misleading Information and contacted Defendants' sales personnel by telephone in July 2023 to obtain further information. During multiple telephone conversations with Defendants' employee (known to Defendants), Plaintiff Castro was again provided with the Misleading Information (namely that he would be provided high quality, useful Leads) by Defendants and encouraged to enter into an oral agreement with Defendants for Leads. During the conversation, Plaintiff Castro was also told that he would be one (1) of no more than two real estate agents who would receive Leads per zip code purchased.  Such statement was not true and was known by Defendants to be a false statement.  Despite knowing about the entirety of the Scheme (and the inclusion of Fake Leads in the Leads that were promised by Defendants as part of the agreement), Defendants reasserted the Misleading Information for the sole purpose of fraudulently inducing Plaintiff Castro to enter into the oral agreement and begin subscription services with Defendants, and Plaintiff

Castro did actually and reasonably rely on the Misleading Information by providing his credit card number to Defendants at the conclusion of the sales call to initiate a subscription for Leads. Additionally, Plaintiff Castro was aware of the affiliation between Defendant NAR and each of NAR's  co-Defendants herein when he entered into the oral agreement with Defendants. As NAR had ardently presented itself as an advocate for real estate agents (including each Plaintiff), Plaintiff Castro trusted the Defendants and believed the Misleading Information to be true, accurate and beneficial.   In reasonable reliance upon the Misleading Information that had then be repeatedly provided to him, Plaintiff Castro verbally agreed to enter into a subscription-based agreement with Defendants for Leads as described herein.

       d.    Plaintiff Michael Echternkamp received the Misleading Information from Defendants thorough the marketing efforts of the Defendants. Such marketing efforts included disseminating the Misleading Information to Castro. Plaintiff Castro reasonably relied upon the Misleading Information and contacted Defendants' sales personnel by telephone in 2021 to obtain further information. During multiple telephone conversations with Defendants' employee (known to Defendants), Plaintiff Castro was again provided with the Misleading Information (namely that he would be provided high quality, useful Leads) by Defendants and encouraged to enter into an oral agreement with Defendants for Leads. During the conversation, Plaintiff Castro was also told that he would be one (1) of no more than two real estate agents who would receive Leads per zip code purchased.   Such statement was not true and was known by Defendants to be a false statement.  Despite knowing about the entirety of the Scheme (and the inclusion of Fake Leads in the Leads that were promised by Defendants as part of the agreement), Defendants reasserted the Misleading Information for the sole purpose of fraudulently inducing Plaintiff Castro to enter into the oral agreement and begin subscription services with Defendants, and Plaintiff Castro did actually and reasonably rely on the Misleading Information by providing his credit card number to Defendants at the conclusion of

the sales call to initiate a subscription for Leads. Additionally, Plaintiff Castro was aware of the affiliation between Defendant NAR and each of NAR's co-Defendants herein when he entered into the oral agreement with Defendants. As NAR had ardently presented itself as an advocate for real estate agents (including each Plaintiff), Plaintiff Castro trusted the Defendants and believed the Misleading Information to be true, accurate and beneficial.  In reasonable reliance upon the Misleading Information that had then be repeatedly provided to him, Plaintiff Castro verbally agreed to enter into a subscription-based agreement with Defendants for Leads as described herein.

e.    Plaintiff Kamesha Sylvester Hamilton received the Misleading Information from Defendants thorough the marketing efforts of the Defendants. Such marketing efforts included disseminating the Misleading Information to Hamilton. Plaintiff Hamilton reasonably relied upon the Misleading Information and contacted Defendants' sales personnel by telephone in or about January 2022. During multiple telephone conversations with Defendants' employee (known to Defendants), Plaintiff Hamilton was again provided with the Misleading Information by Defendants (namely that he would be provided high quality, useful leads on prospective buyers) and encouraged to enter into the oral agreement with Defendants for Leads. Plaintiff Hamilton was also told that she would be one (1) of no more than two real estate agents who would receive Leads per zip code purchased.  Such statement was not true and was known by Defendants to be a false statement. Despite knowing about the entirety of the Scheme (and the inclusion of Fake Leads in the Leads that were promised by Defendants as part of the agreement), Defendants reasserted the Misleading Information for the sole purpose of fraudulently inducing Plaintiff Hamilton to enter into the oral agreement and begin subscription services with Defendants, and Plaintiff Hamilton did actually and reasonably rely on the Misleading Information by providing his credit card number to Defendants at the conclusion of the sales call to initiate a subscription for Leads. Additionally, Plaintiff Hamilton was

1  aware of the affiliation between Defendant NAR and each of NAR's co-Defendants
2  herein when she entered into the oral agreement with Defendants. As NAR had
3  ardently presented itself as an advocate for real estate agents (including each
4  Plaintiff), Plaintiff Hamilton trusted the Defendants and believed the Misleading
5  Information to be true, accurate and beneficial.

6        f.      Plaintiff Maria Hardy received the Misleading Information from
7  Defendants thorough the marketing efforts of the Defendants. Such marketing efforts
8  included disseminating the Misleading Information to Hardy. Plaintiff Hardy
9  reasonably relied upon the Misleading Information and contacted Defendants' sales
10 personnel by telephone in or about February 2022. During multiple telephone
11 conversations with Defendants' employee (known to Defendants), Plaintiff Hardy
12 was again provided with the Misleading Information (namely that she would be
13 provided high quality, useful leads on prospective buyers) by Defendants and
14 encouraged to enter into an oral agreement with Defendants for Leads. Plaintiff Hardy
15 was also told that she would be one (1) of no more than two real estate agents who
16 would receive Leads per zip code purchased.  Such statement was not true and was
17 known by Defendants to be a false statement. Despite knowing about the entirety of
18 the Scheme (and the inclusion of Fake Leads in the Leads that were promised by
19 Defendants as part of the agreement), Defendants reasserted the Misleading
20 Information for the sole purpose of fraudulently inducing Plaintiff Hardy to enter into
21 the oral agreement and begin subscription services with Defendants, and Plaintiff
22 Hardy did actually and reasonably rely on the Misleading Information by providing
23 her credit card number to Defendants at the conclusion of the sales call to initiate a
24 subscription for Leads. Additionally, Plaintiff Hardy was aware of the affiliation
25 between Defendant NAR and each of NAR's co-Defendants herein when she entered
26 into the oral agreement with Defendants. As NAR had ardently presented itself as an
27 advocate for real estate agents (including each Plaintiff), Plaintiff Hardy trusted the
28 Defendants and believed the Misleading Information to be true, accurate and

beneficial.

   g. Plaintiff Nidia Sanchez received the Misleading Information from Defendants thorough the marketing efforts of the Defendants. Such marketing efforts included disseminating the Misleading Information to Sanchez. Plaintiff Sanchez reasonably relied upon the Misleading Information and contacted Defendants' sales personnel by telephone in or about November 2022. During multiple telephone conversations with Defendants' employee (known to Defendants), Plaintiff Sanchez was again provided with the Misleading Information (namely that she would be provided high quality, useful leads on prospective buyers) by Defendants and encouraged to enter into the oral agreement with Defendants for Leads. Plaintiff Hamilton was also told that she would be one (1) of no more than two real estate agents who would receive Leads per zip code purchased.  Such statement was not true and was known by Defendants to be a false statement. Despite knowing about the entirety of the Scheme (and the inclusion of Fake Leads in the Leads that were promised by Defendants as part of the agreement), Defendants reasserted the Misleading Information for the sole purpose of fraudulently inducing Plaintiff Sanchez to enter into the oral agreement and begin subscription services with Defendants, and Plaintiff Sanchez did actually and reasonably rely on the Misleading Information by providing her credit card number to Defendants at the conclusion of the sales call to initiate a subscription for Leads. Additionally, Plaintiff Sanchez was aware of the affiliation between Defendant NAR and each of NAR's  co-Defendants herein when she entered into the oral agreement with Defendants. As NAR had ardently presented itself as an advocate for real estate agents (including each Plaintiff), Plaintiff Sanchez trusted the Defendants and believed the Misleading Information to be true, accurate and beneficial.

   h. Plaintiff Cliff Woodhall has been a customer of Defendants for approximately ten (10) years. Similar to the other Plaintiffs, Plaintiff Woodhall received the Misleading Information from Defendants thorough the marketing efforts

of the Defendants. Such marketing efforts included disseminating the Misleading Information to Woodhall. Plaintiff Woodhall reasonably relied upon the Misleading Information and contacted Defendants' sales personnel by telephone. During multiple telephone conversations with Defendants' employee (known to Defendants), Plaintiff Woodhall was again provided with the Misleading Information by Defendants (namely that he would be provided high quality, useful leads on prospective buyers) and encouraged to enter into an oral agreement with Defendants for Leads.. Plaintiff Woodhall was also told that he would be one (1) of no more than two real estate agents who would receive Leads per zip code purchased.  Such statement was not true and was known by Defendants to be a false statement. Despite knowing about the entirety of the Scheme (and the inclusion of Fake Leads in the Leads that were promised by Defendants as part of the agreement), Defendants reasserted the Misleading Information for the sole purpose of fraudulently inducing Plaintiff Woodhall to enter into the oral agreement and continue subscription services with Defendants, and Plaintiff Woodhall did actually and reasonably rely on the Misleading Information by providing his credit card number to Defendants at the conclusion of the sales call to continue a subscription for Leads. Additionally, Plaintiff Woodhall was aware of the affiliation between Defendant NAR and each of NAR's  co-Defendants herein when she entered into the oral agreement with Defendants. As NAR had ardently presented itself as an advocate for real estate agents (including each Plaintiff), Plaintiff Woodhall trusted the Defendants and believed the Misleading Information to be true, accurate and beneficial.

31.     After signing up each Plaintiff (and each prospective Plaintiff) over the telephone, then Defendants provided each Plaintiff (and each prospective plaintiff) with an internet link to a dynamic web page which was under the control of Defendants and which could (and was) unilaterally changed from time-to-time by Defendants. The webpage  contained a series of terms and conditions that were not referenced in the sales calls between Defendants' sales' representative and each

Plaintiff and only accessible if each Plaintiff clicked on a link to access the terms and conditions. Thereafter, Defendants would periodically change and modify the terms and conditions on its website in furtherance of the Scheme. Plaintiffs allege that such unilateral efforts to modify the oral agreements were not agreed upon by Plaintiffs and are not enforceable.

32.    Later, when the inevitable disputes arose, Defendants would contend that various version(s) of the terms and conditions was part of the "agreement" in effect when each such Plaintiff entered into the transaction, which was untrue.

33.    In so doing, Defendants did (and intended to) conceal the fraudulent nature of the statements made by Defendants' sales representatives to induce each such Plaintiff to enter into an agreement with Defendants.

34.    As a result, each such Plaintiff was first fraudulently induced to enter into the oral agreement to pay monies to Defendants for the Lead Generation services based upon the terms which were verbally shared with each such Plaintiff. Those terms included:

a) Each such Plaintiff would receive 36-40 legitimate "leads" per month, per zip code purchased;

b) Each such Plaintiff would pay the agreed amount each month;

c) The "leads" were valid (as aforesaid);

d) The leads were exclusive, shared with one other real estate agent or being provided on a very limited basis; and

e) Defendants would reimburse Plaintiff for any invalid "leads"

35.    Notwithstanding the foregoing, Defendants shared the Misleading Information to not only induce each such Plaintiff to enter into the foregoing agreement; but with specific knowledge and intent to change the terms of the agreement and assert that each such Plaintiff had agreed to the applicable written documents, terms and conditions later created by Defendants, in some cases well after each Plaintiff agreed to purchase the Fake Leads.

36.    Defendants' conduct resulted in each such Plaintiff paying monthly subscription fees to Defendants and each such Plaintiff not receiving the benefit of the Misleading Information.

37.    Each such Plaintiff complained about the Fake Leads and sought refund(s) and/or partial refunds from the Defendants. However, the Defendants then would engage in the Attrition Program (which included showing or reciting the Fraudulent Terms to each such Plaintiff) and asserting that each such Plaintiff was not entitled to any such relief.

38.    In each such situation, Defendants failed and refused to refund the monies paid by the applicable Plaintiff and/or to offer any reasonable make-good therefor.

39.    As a direct, foreseeable, legal, actual and proximate result of the foregoing conduct by the Defendants, each such Plaintiff suffered and continues to suffer financial losses and other substantial and related losses in earnings, benefits, quality of life, goodwill; and has suffered and continues to suffer humiliation, ridicule, contempt, embarrassment, severe mental and emotional distress, damage to Plaintiff's reputation, discomfort and other damages, the precise amount of which will be proven at trial.

40.    Defendants, their senior executives, managing agents, managers, directors and officers (collectively "Leadership") committed the acts described in this cause of action intentionally, willfully, oppressively, fraudulently and maliciously for the purpose of injuring Plaintiff and depriving Plaintiff of Plaintiff's rights. Such conduct by the Defendants (and each of them) was extremely reckless and capricious and subjected each such Plaintiff to the cruel and unjust hardships of the Scheme. The Leadership, at all relevant times, was aware of the Scheme and its design and elements. In fact, Defendants have been involved in other litigation for such practices and the allegations in such litigation were reported to Leadership as far back as 2018. Before and after such litigation, Leadership decided to continue engaging in the

Unlawful Conduct alleged herein. In addition, articles in the press and hundreds of complaints on job boards have been published. Defendants' Leadership are likewise aware of the foregoing. Efforts were taken by the Defendants to conceal such Unlawful Conduct and the Leadership were aware of such efforts. Furthermore, the complaints were widespread and well-known to Leadership. Despite the foregoing, the Unlawful Conduct continued with the full knowledge and approval of Leadership. Such Leadership includes former officers (e.g., current and preceding Chief Executive Officer, current General Counsel and former Executive Vice President and Secretary, former VP Sales, former President and others). Such conduct on the part of Defendants and those persons was intentional, oppressive, fraudulent, malicious and done in a wanton effort to deprive each such Plaintiff of that Plaintiff's fundamental rights. Defendants and those persons intended to cause injury to Plaintiff and engaged in conduct with such a willful and conscious disregard of Plaintiff's fundamental rights by utilizing each such Defendants superior power, trust and authority over each such Plaintiff. As all of the foregoing conduct was undertaken by the Defendants and their owners, managing agents, senior executives, supervisors, directors and officers; each such Plaintiff also seeks any allowable and/or appropriate punitive or exemplary damages which may be or become available against Defendants in an amount appropriate to punish and make an example of them in addition to the other damages sought herein, subject to applicable law.

41.     In connection with all of the foregoing conduct, a relationship existed between the Defendants and each such Plaintiff. Each such relationship was such that the Defendants were (and are required to account to each such Plaintiff as it relates to monies expended, refunds, partial refunds, credits and the value of what the Defendants promised to each such Plaintiff (which is what each such Plaintiff paid for) and what was actually received by each such Plaintiff. In addition, each such Plaintiff is entitled, by virtue of the oral agreement made between Defendants and each such Plaintiff) to a balance owed which Defendants have failed and refused

to pay. The amount of such balance due to each such Plaintiff requires calculations based upon information solely within the possession and control of the Defendants. at this point and an accounting is

necessary to make such determination. The accounting records maintained by the Defendants in connection with each such Plaintiff are complicated, complex and were intentionally created and maintained by the Defendants in a confusing and unintelligible manner. Accordingly, an accounting is necessary to fully determine the amount(s) due to each such Plaintiff.

## II. SECOND CAUSE OF ACTION
## BY PLAINTIFFS (AND THOSE SIMILARLY SITUATED)
## AGAINST EACH DEFENDANT FOR BREACH OF ORAL CONTRACT

42.     Plaintiffs reallege and incorporate herein by this reference Paragraphs 1-40 above as though set forth fully here.

43.     After having received the Misleading Information and in reliance thereupon, each Plaintiff entered into an oral agreement with a sales' representative employed by Defendant Move, Inc. (individually and as agent for each of their co-Defendants). The terms of each of the oral agreements (the "Oral Agreements") were as follows:

            a) Each Plaintiff would receive legitimate Leads;

            b) For a monthly fee, each Plaintiff would receive a specific number of Leads;

            c) Leads would be properly accounted for in the event that such Leads did not have the characteristics of a "Lead" as set forth hereinabove;

            d) Defendants would refund or credit (at Plaintiffs' election) for any Leads which did not have such characteristics of a "Lead" as set forth herein and e) Each such Oral Agreement was entered into in and subject to the laws of the State of

California.

44.    In each instance of each transaction, each Plaintiff paid monies to Defendants based upon each of the Oral Agreements and complied with the terms thereof in good faith. Notwithstanding the foregoing, Defendants proceeded with the Scheme and sold 40%-50% or more Fake Leads within each and every transaction related to the Leads and the Lead Generation Business products to each Plaintiff.

45.    Defendants failed and refused to refund, properly credit, account for and/or otherwise compensate each Plaintiff for the "Shortages". [For purpose hereof, the "Shortages" shall refer to the amount paid by each Plaintiff multiplied by a fraction which contains the number or Fake Leads contained in each sale as the numerator and the number of total leads (including Leads and Fake Leads) as the denominator].

46.    Plaintiffs complained and requested to be reimbursed or properly credited for the Shortages. Defendants failed and refused to do so and/or partially provided Plaintiffs with more Fake Leads to compensate for the prior Fake Leads.

47.    As a direct, foreseeable, legal, actual and proximate result of the foregoing conduct by the Defendants, each such Plaintiff suffered and continues to suffer financial losses and other substantial and related losses in earnings, benefits and goodwill the precise amount of

which will be proven at trial.

48.    In connection with all of the foregoing conduct, a relationship existed between the Defendants and each such Plaintiff. Each such relationship was such that the Defendants were (and are required to account to each such Plaintiff as it relates to monies expended, refunds, partial refunds, credits and the value of what the Defendants promised to each such Plaintiff (which is what each such Plaintiff paid for) and what was actually received by each such Plaintiff. In addition, each such Plaintiff is entitled, by virtue of the oral agreement made between Defendants and each such Plaintiff) to a balance owed which Defendants have failed and refused

to pay. The amount of such balance due to each such Plaintiff requires calculations based upon information within the possession and control of the Defendants. at this point and an accounting is

necessary to make such determination. The accounting records maintained by the Defendants in connection with each such Plaintiff are complicated, complex and were intentionally created and maintained by the Defendants in a confusing and unintelligible manner. Accordingly, an accounting is necessary to fully determine the amount(s) due to each such Plaintiff.

### III. THIRD CAUSE OF ACTION
### BY PLAINTIFFS (AND THOSE SIMILARLY SITUATED)
### AGAINST EACH DEFENDANT
### FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

49.    Each such Plaintiff re-alleges and incorporates herein by this reference Paragraphs 1-48 above as if they were fully set forth here.

50.    Implied in each of the Oral Agreements referenced in the Second Cause of Action was an implied covenant of good faith and fair dealing. The law implies in every contract said covenant of good faith and fair dealing. The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To fulfill its implied obligation, Defendants were at all times required to give at least as much consideration to the interests of each Plaintiff as it gives to its own interests in connection with each transaction and each Lead.

51.    Defendants breached the covenant of good faith and fair dealing in each Oral Agreement and each transaction conducted pursuant to such Oral Agreement in the following ways:

a) Distributing and training Defendants' sales' team to distribute the

Misleading Information in a manner designed to defraud each Plaintiff;

b) Engaging in the Scheme during the entire lifetime of the relationship between the Defendants and each Plaintiff;

c) Creating an unfair, inequitable, non-responsive, dishonest, laborious, complicated and frustrating dispute resolution process in furtherance of the Scheme which was designed with the intent of placing the likelihood of attrition (i.e., wearing down Plaintiffs and causing them to drop their complaints and claims) over any intention to resolve disputes surrounding Fake Leads (the "Attrition Process").

d) Attempting to unilaterally change, modify and limit the terms of the Oral Agreement by posting and/or linking terms, conditions and other provisions ("Terms and Conditions") which were not provided to the Plaintiffs when the Oral Agreement was entered into and which were designed to undermine the terms of the Oral Agreement in a manner consistent with the Scheme. Such Terms and Conditions were unilaterally changed by Defendants at various times without Plaintiffs' knowledge. Defendants used a dynamic website to post such Terms and Conditions and made multiple, unilateral changes which were only beneficial to Defendants, without notice to Plaintiffs. In furtherance of the Scheme, if Plaintiffs complained about the Fake Leads, Defendants would reference such changed provisions in an effort to avoid refunding monies to Plaintiffs.

e) Attempting to utilize the Terms and Conditions (including those modified multiple times in furtherance of the Scheme. whether such Terms and Conditions were applicable or not), in furtherance of the Scheme and the Attrition Process.

f) Continuing to periodically change and modify the Terms and Conditions and seeking to apply those Terms and Conditions retroactively without the knowledge and/or consent of the Plaintiffs;

g) Specifically training Defendants' employees to further the Scheme, further the Attrition Process and to regularly defraud, deceive and manipulate each

1  Plaintiff to allow Defendants to continue selling Fake Leads in every transaction;

2      h) Intentionally and wrongfully delaying, not responding to and/or
3  denying legitimate claims and complaints by each Plaintiff for refunds and proper
4  accountings in connection with the Fake Leads;

5      i) Other similar conduct designed to further the Scheme and the Attrition
6  Process.

7      52.   Each of the foregoing breaches were undertaken by Defendants
8  intentionally and with the specific and actual knowledge that such conduct was
9  unlawful and would cause harm to each Plaintiff. In connection with each transaction
10 between Plaintiffs and Defendants, Defendants engaged in the Scheme and the
11 Attrition Program, in connection with each transaction, with the specific intention of
12 reducing the value and benefit to each Plaintiff and simultaneously increasing the
13 value and benefit to Defendants… at the expense of Plaintiffs. Defendants
14 intentionally shifted the value and consideration which Defendants and Plaintiffs
15 respectively bargained for in each agreement for reach transaction. Defendants took
16 such actions specifically for the purpose of injuring the rights of each Plaintiff in each
17 transaction. Defendants intentionally and deliberately placed their own interests and
18 profitability above the agreed-upon, exchange of value in each transaction with each
19 Plaintiff. the other to receive the agreement's benefits. To fulfill its implied obligation,
20 Defendants gave no consideration to the interest of Plaintiffs and placed profitability
21 and growth over required good faith and fair dealing which was implied into each of
22 the Oral Agreements and into each transaction by each Plaintiff.

23     53.   Each instance of such conduct by Defendants, caused Shortages and
24 financial harm to each Plaintiff. As a direct, foreseeable, legal, actual and proximate
25 result of the foregoing conduct by the Defendants, each such Plaintiff suffered and
26 continues to suffer financial losses and other substantial and related losses in earnings,
27 benefits, quality of life, goodwill; and has suffered and
28 continues to suffer humiliation, ridicule, contempt, embarrassment, severe mental and

- 34 -                                                     Case No.:

1  emotional distress, damage to Plaintiff's reputation, discomfort and other damages,

2  the precise amount of which will be proven at trial.

3      54. Defendants, their senior executives, managing agents, managers, directors

4  and officers (collectively "Leadership") committed the acts described in this cause of

5  action intentionally, willfully, oppressively, fraudulently and maliciously for the

6  purpose of injuring Plaintiff and depriving Plaintiff of Plaintiff's rights. Such conduct

7  by the Defendants (and each of them) was extremely reckless and capricious and

8  subjected each such Plaintiff to the cruel and unjust hardships of the Scheme. The

9  Leadership, at all relevant times, was aware of the Scheme and its design and

10  elements. In fact, Defendants have been involved in other litigation for such practices

11  and the allegations in such litigation were reported to Leadership as far back as 2018.

12  Before and after such litigation, Leadership decided to continue engaging in the

13  Unlawful Conduct alleged herein. In addition, articles in the press and hundreds of

14  complaints on job boards have been published. Defendants' Leadership are likewise

15  aware of the foregoing. Efforts were taken by the Defendants to conceal such

16  Unlawful Conduct and the Leadership were aware of such efforts. Furthermore, the

17  complaints were known to Leadership. Despite the foregoing, the Unlawful Conduct

18  continued with the full knowledge and approval of Leadership. Such Leadership

19  includes former officers (e.g., current and preceding Chief Executive Officer, current

20  General Counsel and former Executive Vice President and Secretary,  former VP

21  Sales,  former President and others).

22      55.  Such conduct on the part of Defendants and those persons was intentional,

23  oppressive, fraudulent, malicious and done in a wanton effort to deprive each such

24  Plaintiff of that Plaintiff's fundamental rights. Defendants and those persons intended

25  to cause injury to Plaintiff and engaged in conduct with such a willful and conscious

26  disregard of Plaintiff's fundamental rights by utilizing each such Defendants superior

27  power, trust and authority over each such Plaintiff. As all of the foregoing conduct

28  was undertaken by the Defendants and their owners, managing agents, senior

executives, supervisors, directors and officers; each such Plaintiff also seeks any allowable and/or appropriate punitive or exemplary damages which may be or become available against Defendants in an amount appropriate to punish and make an example of them in addition to the other damages sought herein, subject to applicable law

56. In connection with all of the foregoing conduct, a relationship existed between the Defendants and each such Plaintiff. Each such relationship was such that the Defendants were (and are required to account to each such Plaintiff as it relates to monies expended, refunds, partial refunds, credits and the value of what the Defendants promised to each such Plaintiff (which is what each such Plaintiff paid for) and what was actually received by each such Plaintiff. In addition, each such Plaintiff is entitled, by virtue of the oral agreement made between Defendants and each such Plaintiff) to a balance owed which Defendants have failed and refused to pay. The amount of such balance due to each such Plaintiff requires calculations based upon information within the possession and control of the Defendants. at this point and an accounting is necessary to make such determination. The accounting records maintained by the Defendants in connection with each such Plaintiff are complicated, complex and were intentionally created and maintained by the Defendants in a confusing and unintelligible manner. Accordingly, an accounting is necessary to fully determine the amount(s) due to each such Plaintiff.

## IV. FOURTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANTS
## FOR FRAUD (MISREPRESENTATION)

57. Plaintiffs re-allege and incorporate herein by this reference Paragraphs 1 56 above as if they were fully set forth here.

58. Each element of the Misleading Information was communicated by Defendants to each Plaintiff via Defendants' owned and operated digital media

properties and Defendants' Affiliates continuously over the past five (5) years or more. Such Misleading Information was further repeated by Defendants (through their employees who comprised their sales' teams) to each Plaintiff in connection with each Oral Agreement. Such communications were made via telephone and, in some cases, via electronic mail communications during the time just before each Oral Agreement was entered into. At the times of each such communication, Defendants knew that the Misleading Information was untrue. The Misleading Information was communicated to each Plaintiff for the specific purpose of fraudulently inducing each Plaintiff to enter into each of the Oral Agreements and to fraudulently induce each Plaintiff to commence and continue to pay fees to Defendants. Each Plaintiff justifiably and reasonably relied upon the Misleading Information in entering into the Oral Agreements and paying fees to Defendants. Such reliance was to the detriment of each Plaintiff as each Plaintiff ultimately suffered from the Fake Leads and the Shortages. Defendants knew that the Shortages would occur and had no intention on honoring the Misleading Information, the Oral Agreement and/or other similar representations made by Defendants to each Plaintiff.

59.  In connection with the Attrition Program, Defendants' employees made Numerous verbal claims that each Plaintiff would receive a refund or credit in connection with each of the Fake Leads and the resulting Shortages. These communications occurred in a series of telephonic (and some electronic mail) communications when each Plaintiff contacted Defendants to inquire about the Fake Leads and the Shortages. Such Shortages were caused solely by Defendants' intentional conduct in communicating the Misleading Information to each Plaintiff and in implementing the Scheme and the Attrition Program. Each Plaintiff justifiably and reasonably relied upon the foregoing fraudulent statements (i.e., those contained in the Misleading Information and the Attrition Program) in continuing to pay fees to Defendants after having received the Fake Leads. Such reliance was to the detriment of each Plaintiff as each Plaintiff ultimately suffered from the Fake Leads and the

Shortages. Defendants knew that the Shortages would occur and had no intention on honoring the Misleading Information, the Oral Agreement and/or other similar representations made by Defendants to each Plaintiff.

60.  The fraudulent statements and misrepresentations referenced in the Misleading Information and communicated as part of the Scheme and as referenced in Paragraphs    were made to each Plaintiff by Defendants' employees. Such statements were scripted by Defendants and those scripts were provided to Defendants employees for the purpose of consistently and repeatedly continuing such fraudulent statements and misrepresentations to each Plaintiff. Defendants would periodically modify and revise these scripts to be more effective in defrauding each of the Plaintiffs; but with no other purpose. Defendants employees were trained in how to maximize the benefit of making such statements to each Plaintiff for the benefit of the Defendants and to the detriment of each Plaintiff.  Each Plaintiff acted justifiably and reasonably relied upon these statements which were made by Defendants employees. As a result of such reasonable reliance, each Plaintiff suffered by receiving Fake Leads and incurring Shortages.

61.  As a direct, foreseeable, legal, actual and proximate result of the foregoing conduct by the Defendants, each such Plaintiff suffered and continues to suffer financial losses and other substantial and related losses in earnings, benefits, quality of life, goodwill; and has suffered and continues to suffer humiliation, ridicule, contempt, embarrassment, severe mental and emotional distress, damage to Plaintiff's reputation, discomfort and other damages, the precise amount of which will be proven at trial.

62.  Defendants, their senior executives, managing agents, managers, directors and officers (collectively "Leadership") committed the acts described in this cause of action intentionally, willfully, oppressively, fraudulently and maliciously for the purpose of injuring Plaintiff and depriving Plaintiff of Plaintiff's rights. Such conduct by the Defendants (and each of them) was extremely reckless and capricious and

subjected each such Plaintiff to the cruel and unjust hardships of the Scheme. The Leadership, at all relevant times, was aware of the Scheme and its design and elements. In fact, Defendants have been involved in other litigation for such practices and the allegations in such litigation were reported to Leadership as far back as 2018. Before and after such litigation, Leadership decided to continue engaging in the Unlawful Conduct alleged herein. In addition, articles in the press and hundreds of complaints on job boards have been published. Defendants' Leadership are likewise aware of the foregoing. Efforts were taken by the Defendants to conceal such Unlawful Conduct and the Leadership were aware of such efforts. Furthermore, the press articles and complaints which were widely-published were known to Leadership. Despite the foregoing, the Unlawful Conduct continued with the full knowledge and approval of Leadership. Such Leadership includes former officers (e.g., current and preceding Chief Executive Officer, current General Counsel and former Executive Vice President and Secretary, former VP Sales, former President and others). Such conduct on the part of Defendants and those persons was intentional, oppressive, fraudulent, malicious and done in a wanton effort to deprive each such Plaintiff of that Plaintiff's fundamental rights. Defendants and those persons intended to cause injury to Plaintiff and engaged in conduct with such a willful and conscious disregard of Plaintiff's fundamental rights by utilizing each such Defendants superior power, trust and authority over each such Plaintiff. As all of the foregoing conduct was undertaken by the Defendants and their owners, managing agents, senior executives, supervisors, directors and officers; each such Plaintiff also seeks any allowable and/or appropriate punitive or exemplary damages which may be or become available against Defendants in an amount appropriate to punish and make an example of them in addition to the other damages sought herein, subject to applicable law.

63.   In connection with all of the foregoing conduct, a relationship existed between the Defendants and each such Plaintiff. Each such relationship was such that the Defendants were (and are required to account to each such Plaintiff as it relates to

monies expended, refunds, partial refunds, credits and the value of what the Defendants promised to each such Plaintiff (which is what each such Plaintiff paid for) and what was actually received by each such Plaintiff. In addition, each

such Plaintiff is entitled, by virtue of the oral agreement made between Defendants and each such Plaintiff) to a balance owed which Defendants have failed and refused to pay. The amount of such balance due to each such Plaintiff requires calculations based upon information within the possession and control of the Defendants. at this point and an accounting is necessary to make such determination. The accounting records maintained by the Defendants in connection with each such Plaintiff are complicated, complex and were intentionally created and maintained by the Defendants in a confusing and unintelligible manner. Accordingly, an accounting is necessary to fully determine the amount(s) due to each such Plaintiff.

## V. FIFTH CAUSE OF ACTION
### BY PLAINTIFFS AGAINST ALL DEFENDANTS
### FOR CONVERSION

64. Plaintiff re-alleges and incorporates herein by this reference Paragraphs 1-63 above as if they were fully set forth here.

65. In connection with each transaction between each Plaintiff and Defendants; Plaintiff paid money to Defendants in exchange for Defendants promise to deliver legitimate Leads to Plaintiff in the area and quantity provided for in each of the Oral Agreements.

66. In connection with each such transaction, Defendants were to exchange the Leads (without any Fake Leads) to each Plaintiff. Similarly, Defendants were to reimburse or properly credit each Plaintiff for each and every Fake Lead received by each Plaintiff.

67. At the time of each transaction, Defendants knew that each Plaintiff would receive a

large percentage (40%-50% or more) of Fake Leads while paying for zero percent (0%) Fake Leads.

68.  Defendants took each Plaintiffs money under the guise of providing the Leads (without any Fake Leads) pursuant to the Oral Agreements. Yet, all the while, Defendants knew that Defendants were proceeding unlawfully and in furtherance of the Scheme.

69.  By failing and refusing to refund and/or credit each Plaintiff for the Fake Leads and the resulting Shortages; Defendants unlawfully converted Plaintiffs' payments into Defendants' revenue.

70.  As a direct, foreseeable, legal, actual and proximate result of the foregoing conduct by the Defendants, each such Plaintiff suffered and continues to suffer financial losses and other substantial and related losses in earnings, benefits, quality of life, goodwill; and has suffered and continues to suffer humiliation, ridicule, contempt, embarrassment, severe mental and emotional distress, damage to Plaintiff's reputation, discomfort and other damages, the precise amount of which will be proven at trial.

71.  Defendants, their senior executives, managing agents, managers, directors and officers (collectively "Leadership") committed the acts described in this cause of action intentionally, willfully, oppressively, fraudulently and maliciously for the purpose of injuring Plaintiff and depriving Plaintiff of Plaintiff's rights. Such conduct by the Defendants (and each of them) was extremely reckless and capricious and subjected each such Plaintiff to the cruel and unjust hardships of the Scheme.  The Leadership, at all relevant times, was aware of the Scheme and its design and elements. In fact, Defendants have been involved in other litigation for such practices and the allegations in such litigation were reported to Leadership as far back as 2018. Before and after such litigation, Leadership decided to continue engaging in the Unlawful Conduct alleged herein. In addition, articles in the press and hundreds of complaints on job boards have been published. Defendants' Leadership are likewise

aware of the foregoing. Efforts were taken by the Defendants to conceal such Unlawful Conduct and the Leadership were aware of such efforts. Furthermore, the complaints were known to Leadership. Despite the foregoing, the Unlawful Conduct continued with the full knowledge and approval of Leadership. Such Leadership includes former officers (e.g., current and preceding Chief Executive Officer, current General Counsel and former Executive Vice President and Secretary, former VP Sales, former President and others). Such conduct on the part of Defendants and those persons was intentional, oppressive, fraudulent, malicious and done in a wanton effort to deprive each such Plaintiff of that Plaintiff's fundamental rights. Defendants and those persons intended to cause injury to Plaintiff and engaged in conduct with such a willful and conscious disregard of Plaintiff's fundamental rights by utilizing each such Defendants superior power, trust and authority over each such Plaintiff. As all of the foregoing conduct was undertaken by the Defendants and their owners, managing agents, senior executives, supervisors, directors and officers; each such Plaintiff also seeks any allowable and/or appropriate punitive or exemplary damages which may be or become available against Defendants in an amount appropriate to punish and make an example of them in addition to the other damages sought herein, subject to applicable law.

72. In connection with all of the foregoing conduct, a relationship existed between the Defendants and each such Plaintiff. Each such relationship was such that the Defendants were (and are required to account to each such Plaintiff as it relates to monies expended, refunds, partial refunds, credits and the value of what the Defendants promised to each such Plaintiff (which is what each such Plaintiff paid for) and what was actually received by each such Plaintiff. In addition, each such Plaintiff is entitled, by virtue of the oral agreement made between Defendants and each such Plaintiff) to a balance owed which Defendants have failed and refused to pay. The amount of such balance due to each such Plaintiff is non-ascertainable as it requires calculations based upon information within the possession and control of the

Defendants. at this point and an accounting is necessary to make such determination. The accounting records maintained by the Defendants in connection with each such Plaintiff are complicated, complex and were intentionally created and maintained by the Defendants in a confusing and unintelligible manner. Accordingly, an accounting is necessary to fully determine the amount(s) due to each such Plaintiff.

### VI. *NOTICE (ONLY) OF POTENTIAL*  SIXTH CAUSE OF ACTION (RESERVED)
### BY PLAINTIFFS AGAINST ALL DEFENDANTS
### FOR VIOLATION OF THE CALIFORNIA CIVIL LEGAL REMEDIES ACT

73.  Plaintiff re-alleges and incorporates herein by this reference Paragraphs 1-72 above as if they were fully set forth here.

74.  Simultaneously with the service of this Complaint, Plaintiffs are providing Defendants with the required notice under the Consumer Legal Remedies Act embodied in California Civil Code Section 1760 et seq (the "CLRA"). Plaintiffs are consumers as defined in Section 1761(d) who paid for "services" as defined in Section 1761(a). Defendants accepted payments from Plaintiffs and engaged in the Scheme and the other unlawful conduct alleged hereinabove within the State of California sufficient to apply California law to the Plaintiffs' consumer protection claims.

75.  Plaintiffs intend to seek equitable relief only pursuant to the CLRA and may also seek monetary relief and damages thereunder in the event that Defendants do not comply with the relevant law(s) upon which this cause of action is based. Such equitable relief to be sought by Plaintiffs shall include  that this Court enjoin Defendants from continuing to employ the unlawful means alleged herein pursuant to Section 1780(a)(2). Such equitable relief is intended to consist of the following relief:

a)  That Defendants refrain from disseminating the Misleading Information;

1          b) That Defendants refrain from engaging in the Scheme;

2          c) That Defendants refrain from providing Fake Leads and take all

3    reasonable precautions against Fake Leads being sold with Leads;

4          d) That Defendants refrain from implementing the Attrition Program and

5          e) That Defendants provide fully reconciled, accurate and complete

6    accountings to each Plaintiff which include identification of monetary credits owed

7    for each Fake Lead and each Shortage.

8          76.  The CLRA declares as unlawful several "methods of competition and

9    unfair or deceptive acts or practices undertaken by any person in a transaction

10   intended to result or which results in the sale or lease of goods or services to any

11   consumer". By distributing the Misleading Information for the purposes of defrauding

12   Plaintiffs and others and by engaging in the Scheme, the Attrition Program and the

13   other unlawful conduct alleged herein (collectively the "Unlawful Conduct"),

14   Defendants have violated the CLRA.

15         77.  Section 1770 of the CLRA lists 23 prohibited "unfair methods of

16   competition and unfair or deceptive acts or practices." Any of the enumerated acts is

17   prohibited in regard to the sale of goods or services. The following are some of the

18   prohibited acts under CLRA which Defendants committed while engaging in the

19   Unlawful Conduct:

20         (1) Passing off goods or services as those of another.

21         (2) Misrepresenting the source, sponsorship, approval, or certification of

22   goods or services.

23         (3) Misrepresenting the affiliation, connection, or association with, or

24   certification by, another.

25         (4) Using deceptive representations or designations of geographic origin

26   in connection with goods or services.

27         (5) Representing that goods or services have sponsorship, approval,

28   characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

person has a sponsorship, approval, status, affiliation or connection that he or she does not have.

(6) Representing that goods are original or new if they have deteriorated unreasonably or are altered, reconditioned, reclaimed, used, or secondhand.

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(8) Disparaging the goods, services, or business of another by false or misleading representation of fact.

(9) Advertising goods or services with intent not to sell them as advertised.

(10) Advertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity.

(11) …

(12) …

(13) …

(14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law.

(15) Representing that a part, replacement, or repair service is needed when it is not.

(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

78. Defendants have violated and continue to violate Section 1770(a)(7) of the CRLA by engaging in the Unlawful Conduct and related, unfair methods of competition and unfair or fraudulent acts and practices in that they misrepresent the particular standard, quality or grade of the service. Likewise, such conduct violates Section 1770(a)(16).

79. As a result of the business practices and unlawful conduct described above, Plaintiffs are entitled to an order enjoining such future conduct on the part of

- 45 -                                                    Case No.:

Defendants and such other orders and judgments which may be necessary to provide relief to Plaintiffs. Plaintiffs reserve the right to seek such relief as well as the monetary and other relief provided in the CLRA.

### VII. SEVENTH CAUSE OF ACTION
### BY PLAINTIFF AGAINST ALL DEFENDANTS
### FOR UNLAWFUL BUSINESS PRACTICES

80.  Plaintiff realleges and incorporates herein by this reference Paragraphs 1-79 above as though set forth fully here.

81.  Defendants have engaged in unfair, unlawful, and fraudulent business practices in the State of California, as set forth above by engaging in the Unlawful Conduct. Each such act of Unlawful Conduct alleged herein is a separate and distinct act of unfair competition within the meaning of Cal. Bus. & Prof. Code §§17200, et seq.

82.  Cal. Bus. & Prof. Code §§17200, et seq., prohibits acts of unfair competition, which means and includes any unlawful, unfair or fraudulent business act and conduct which is likely to deceive and is fraudulent in nature.

83.  The Unlawful Conduct alleged herein and other business practices undertaken by the Defendants in furtherance of such Unlawful Conduct are unlawful under B&P Section 17200 et seq. by virtue of the fact that such conduct violates the provisions of Civil Code Section 1750 et seq., 2924 et seq. and 2923.5 et seq. These same business practices and the Unlawful Conduct violate numerous other California laws, including those alleged in each cause of action alleged in this Complaint. By virtue of the foregoing, Defendants have engaged in numerous acts of unfair business practices which are prohibited by B&P Section 17200 et seq.

84.  Defendants' Unlawful Conduct (and the acts and practices undertaken by Defendants in furtherance thereof) are ongoing and continues to this date to the detriment of each Plaintiff and in a manner which undermines the value and

professionalism of each real estate agent associated with the National Association of Realtors and/or other similar professional organizations. Defendants' other ongoing conduct has already severely damaged the revenue and reputation of real estate agents around the country and required them to spend significant sums on Fake Leads; yet Defendants continue to engage in the Unlawful Conduct as they generate hundreds of millions of dollars in selling the Fake Leads. Defendants' acts and practices not only deceive and harm the Plaintiffs; but such Unlawful Conduct is also detrimental to the general public.

85.  The totality of the conduct alleged in this cause of action has given Defendants an unfair competitive advantage over their competitors, the Plaintiffs and other real estate agents throughout the country. The Scheme implemented by Defendants is designed to defraud consumers and enrich Defendants.

86.  As a direct, foreseeable, legal, actual and proximate result of the foregoing conduct by the Defendants, each such Plaintiff has lost money or property as a result of Defendants illegal and unfair acts, as set forth above, and is entitled to restitution of his or her losses suffered as a result of Defendants' Fraudulent Scheme.

## **PRAYER FOR RELIEF**

WHEREFORE , Plaintiff prays judgment against Defendants as follows:

1. For general and special damages according to proof;

2. For special damages according to proof;

3. For interest, according to law, on the amount to be ascertained at trial from the applicable date upon which that interest begins to accrue according to law and as proved at trial;

4. For any and all costs and attorneys' fees as provided by law;

5. For allowable and applicable punitive damages in an amount sufficient to deter Defendants from engaging in such conduct again in the future;

6. For equitable relief as set forth herein and

- 47 -

1       7. For any other and further relief according to proof, any applicable law

2  and/or that the Court considers proper.

5

6  DATED: August 23, 2024     _        *Michael S. Traylor*

                                       Michael S. Traylor, Esq.

7                                    Attorney for Plaintiffs